# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DAMIAN BUTLER, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 2:19-CV-2377-JAR-JPO** |
| **DAIMLER TRUCKS NORTH AMERICA, LLC, et al.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs Damian Butler, Alexander Cohen, Gerald Cohen, William Cohen, Nicole Gates, Alisha Mireles, Terrie Myers, and Diane Sanford (collectively, "Plaintiffs") bring this action against Defendants Daimler Trucks North America LLC ("DTNA") and Daimler AG, alleging causes of action for strict product liability and negligence related to a fatal, multivehicle crash that took place on July 11, 2017.  Before the Court is DTNA's Motion to Dismiss (Doc. 20) pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6).  DTNA asserts that this Court does not have personal jurisdiction over it, and that even if it did, Plaintiffs' claims should be dismissed because they are preempted and violate the separation of powers doctrine.  The matter is fully briefed, and the Court is prepared to rule.  For the reasons set forth below, DTNA's motion is **denied**.

## I.     Background

### A.     Procedural Overview

Plaintiffs filed their Complaint on July 10, 2019.[1]  Prior to any responsive pleading by

---

[1] Doc. 1.

Defendants, Plaintiffs filed an Amended Complaint on September 23, 2019.[2] DTNA filed its

Motion to Dismiss on October 14, 2019.[3] Following a scheduling conference with Magistrate

Judge James O'Hara, Plaintiffs were permitted to amend their complaint to clarify the citizenship

status of the parties; however, the parties agreed that Plaintiffs' Second Amended Complaint did

not moot or otherwise impact DTNA's pending Motion to Dismiss. Plaintiffs allege causes of

action for strict product liability and negligence for Defendants' failure to equip a 2015

Freightliner semi-truck trailer (the "Subject Freightliner") with forward collision warning

("FCW") and automatic emergency brake ("AEB") systems.[4] DTNA responded with a Motion

to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), arguing that this

Court does not have personal jurisdiction over it; and even if it did, Plaintiffs' claims are

preempted and violate the doctrine of separation of powers. Plaintiffs have responded, and

DTNA filed a reply.

### B. Accident Giving Rise to Suit

Drawing all reasonable inferences in favor of Plaintiffs, the Second Amended Complaint

sets out the following facts. On July 11, 2017 around 2:23 p.m., Teresa Butler accompanied by

Karen Kennedy, Sheldon Cohen accompanied by Virginia Cohen, and Ricardo Mireles were

driving their respective vehicles westbound on I-70. Behind these three cars, Kenny Ford was

operating the Subject Freightliner, which is categorized as a "Class Eight" heavy truck due to its

weight. Westbound traffic slowed, and Ford failed to adequately adjust the speed of the Subject

---

[2] Doc. 14.

[3] Doc. 20.

[4] FCW and AEB systems are technologies designed to prevent or mitigate auto accidents. If a vehicle is equipped with an FCW system and "a rear-end crash is imminent, the FCW system warns the driver of the threat." Doc. 20-1 at 2. If a vehicle is equipped with an AEB system and a rear-end crash is imminent but the driver takes no action or insufficient action, the AEB system "may automatically apply or supplement the brakes to avoid or mitigate the rear-end crash." *Id.*

Freightliner, causing it to collide with the three passenger vehicles and kill all five occupants. The Subject Freightliner was not equipped with an FCW or AEB system.

### C. Facts Related to Jurisdiction

Plaintiff Damian Butler—who brings suit individually, as administrator of Teresa Butler's estate, and on behalf of all heirs-at-law of Teresa Butler—is an Illinois resident. Plaintiffs Alexander and Gerald Cohen—who bring suit individually, on behalf of all heirs-at-law of Sheldon and Virginia Cohen, and on behalf of the future estates of Sheldon and Virginia Cohen—are both Kansas residents. Terrie Myers—who brings suit as next friend of L.M., a minor, on behalf of all heirs-at-law of Ricardo Mireles, and on behalf of the future estate of Ricardo Mireles—is also a Kansas resident. William Cohen—who brings suit individually, on behalf of all the heirs-at-law of Sheldon and Virginia Cohen, and on behalf of the future estates of Sheldon and Virginia Cohen—is a North Carolina resident. Alisha Mireles—who brings suit individually, as next friend of T.M., a minor, on behalf of all heirs-at-law of Ricardo Mireles, and on behalf of the future estate of Ricardo Mireles—is a Wisconsin resident. Diane Sanford—who brings suit individually, as administrator of the estate of Karen Kennedy, and on behalf of the heirs-at-law of Karen Kennedy—is an Indiana resident.

DTNA is a Delaware limited liability company registered to do business in Kansas. The sole member of DTNA is Daimler Trucks & Buses US Holdings, Inc., which is a Delaware corporation whose principal place of business is in Portland, Oregon. Daimler AG, which has not yet filed a responsive pleading, is a German-based corporation with its principal place of business in Germany.

DTNA designs, manufactures, tests, inspects, markets, and sells vehicles such as the Subject Freightliner involved in the July 11, 2017 wreck. DTNA conducts business in Kansas,

including entering into contracts, sending written and digital communications, maintaining websites, advertising, owning dealerships, selling trucks and parts, providing truck maintenance and repair services, performing warranty repairs, and employing Kansas residents. DTNA sold the Subject Freightliner to an authorized dealer, who sold it to Indian Creek Express LLC, resulting in Indian Creek Express's employee, Kenny Ford, driving the Subject Freightliner at the time of the wreck. The wreck occurred in Kansas. At the time that DTNA manufactured the Subject Freightliner, there were no federal safety standards, regulations, or legislation mandating or prohibiting the installment of FCW or AEB systems on Class Eight trucks.

## II.    Discussion

In its Motion to Dismiss, DTNA argues that this Court does not have personal jurisdiction over it. DTNA contends that the Court lacks specific personal jurisdiction because the instant lawsuit did not arise out of its contacts with Kansas. DTNA also argues that the Court does not have general personal jurisdiction because its contacts with Kansas do not render it "at home" in the state. Additionally, DTNA argues that exercising jurisdiction pursuant to its registration to do business in Kansas would not comport with due process. DTNA also moves for dismissal because, it argues, Plaintiffs' claims are barred by implied obstacle preemption. Finally, DTNA moves for dismissal based on the separation of powers doctrine, alleging that allowing a jury to determine liability in this case "would result in significant judicial interference with the operations of the legislature" since both the federal and Kansas legislatures have delegated authority to agencies to promulgate rules and regulations related to vehicle safety.[5] The Court addresses these issues in turn.

_____

[5] Doc. 20 at 12.

## A. Personal Jurisdiction

Plaintiffs bear the burden of establishing personal jurisdiction over DTNA.[6]  In the absence of an evidentiary hearing, as in this case, a plaintiff must make only a prima facie showing of jurisdiction to defeat a motion to dismiss.[7]  "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant."[8]  Allegations in a complaint are accepted as true if they are plausible, non-conclusory, and non-speculative, to the extent that they are not controverted by submitted affidavits.[9]  When a defendant has produced evidence to support a challenge to personal jurisdiction, the plaintiff has a duty to come forward with competent proof in support of the jurisdictional allegations of the complaint.[10]  Courts resolve all factual disputes in favor of the plaintiff.[11]  Conflicting affidavits are also resolved in the plaintiff's favor, and "the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[12]  "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would

---

[6] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

[7] *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1056–57 (10th Cir. 2008) (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).

[8] *Id.* (quoting *OMI Holdings, Inc.*, 149 F.3d at 1091).

[9] *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–56 (2007)); *Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989) (citing *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987)); *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984).

[10] *Pytlik*, 887 F.2d at 1376 (citing *Becker v. Angle*, 165 F.2d 140, 141 (10th Cir.1947)); *see also Shrader*, 633 F.3d at 1248 (citing *Wenz*, 55 F.3d at 1505).

[11] *Dudnikov*, 514 F.3d at 1070 (citation omitted).

[12] *Behagen*, 744 F.2d at 733 (citing *Am. Land Program, Inc. v. Bonaventura Uitgevers Maatschappij, N.V.*, 710 F.2d 1449, 1454 n.2 (10th Cir. 1983)).

render jurisdiction unreasonable.'"[13]

DTNA argues that this Court lacks personal jurisdiction over it and that Fed. R. Civ. P. 12(b)(2) mandates Plaintiffs' claims against it be dismissed. Plaintiffs assert that DTNA is subject to both specific and general personal jurisdiction.

## 1. Specific Jurisdiction

### a. Legal Standard

Specific jurisdiction exists when "the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'"[14] To establish minimum contacts for the exercise of specific jurisdiction within the bounds of due process, a plaintiff must show: (1) that the defendant purposefully directed activities at the forum state, and (2) that the plaintiff's injuries arise out of the defendant's forum-related activities.[15] The Supreme Court elaborated upon the minimum contacts necessary to support specific jurisdiction in the 2014 case of *Walden v. Fiore*,[16] explaining that the defendant's suit-related conduct must create a substantial connection with the forum state that arises out of contacts between the defendant and the forum state, not contacts between the plaintiff and the forum state, nor contacts between the defendant and persons who

---

[13] *OMI Holdings, Inc.*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[14] *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (alteration in original) (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).

[15] *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414; *Fireman's Fund Ins. Co. v. Thyssen Mining Constr. of Can., Ltd.*, 703 F.3d 488, 493 (10th Cir. 2012) (stating that the defendant's minimum contacts with the state "must show that 'the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State,'" and "[t]he litigation must 'result[ ] from alleged injuries that arise out of or relate to those activities'" (alteration in original) (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 109 (1987); *Intercon, Inc. v. Bell Atl. Internet Sols.*, 205 F.3d 1244, 1247(10th Cir. 2000)); *see also Dudnikov*, 514 F.3d at 1071 (explaining that in the tort context, the court asks whether the nonresident purposefully directed its activities at the forum state; in the contract context, the court sometimes asks if the nonresident availed itself of the privilege of conducting activities or consummating a transaction in the forum state. In all contexts, the nonresident should not be haled into court based on mere random, fortuitous, or attenuated contacts in the forum state).

[16] 571 U.S. 283 (2014).

reside in the forum state. If a plaintiff shows that both the "purposeful direction" and "arising-out-of" prongs of the minimum-contacts test are satisfied, the burden then shifts to the defendant to show that the exercise of specific jurisdiction would "offend[ ] 'traditional notions of fair play and substantial justice.'"[17] The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[18]

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."[19] However, "[a] state court's assertion of jurisdiction exposes defendants to the State's coercive power, and is therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause."[20] Thus, "[t]o obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process."[21]

In conducting the due-process analysis, courts must consider "whether the defendant has such minimum contacts with the forum state 'that he should reasonably anticipate being haled into court there.'"[22] As the Supreme Court explained in its 1945 opinion introducing the minimum-contacts analysis, "due process requires only that in order to subject a defendant to a

---

[17] *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075–76 (10th Cir. 2004) (quoting *OMI Holdings*, 149 F.3d at 1091); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[18] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

[19] *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed R. Civ. P. 4(k)(1)(A)).

[20] *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 918–19 (2011) (citing *Int'l Shoe*, 326 U.S. at 316).

[21] *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (citing *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995)); *see also Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*, 17 F.3d 1302, 1304–05 (10th Cir. 1994) ("The proper inquiry is . . . whether the exercise of jurisdiction is sanctioned by the long-arm statute of the forum state and comports with due process requirements of the Constitution." (citing *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990)).

[22] *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159–60 (10th Cir. 2010) (quoting *OMI Holdings*, 149 F.3d at 1091).

judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[23] "Depending on their relationship to the plaintiff's cause of action, an out-of-state defendant's contacts with the forum state may give rise to either general (all-purpose) jurisdiction or specific (case-linked) jurisdiction."[24]

### b. Analysis

Plaintiffs assert that this Court has specific personal jurisdiction over DTNA pursuant to Kansas' long-arm statute[25] based on: (1) DTNA's transaction of business in Kansas, (2) DTNA's commission of tortious acts in Kansas, (3) DTNA's ownership of property in Kansas through a wholly-owned subsidiary, (4) DTNA's solicitation or service activities in Kansas, which caused injury to persons and property in Kansas, and (5) DTNA's introduction of products into the Kansas market in the ordinary course of trade or use. "Because the Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process," the Court here may "proceed directly to the constitutional issue."[26] "Consequently, this [C]ourt 'need not conduct a statutory analysis apart from the due process analysis,'"[27] and proceeds to evaluate whether Plaintiffs' allegations as to DTNA are consistent with due process. As previously noted, the due-process analysis consists of two considerations: whether the defendant

---

[23] *Int'l Shoe*, 326 U.S. at 316 (citing *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[24] *Old Repub. Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (citing *Intercon*, 205 F.3d at 1247; *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014)).

[25] K.S.A. § 60-308(b)(1).

[26] *Federated Rural Elec. Ins. Corp*, 17 F.3d at 1305 (citing *Volt Delta Res., Inc. v. Devine*, 740 P.2d 1089, 1092 (Kan. 1987)); *see Merriman v. Crompton Corp.*, 146 P.3d 162, 179 (Kan. 2006) ("In Kansas, the long arm statute is construed liberally to assert jurisdiction over nonresident defendants to the full extent allowed by the Due Process Clause." (citing *Kluin v. Am. Suzuki Motor Corp.*, 56 P.3d 829 (Kan. 2002))).

[27] *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011) (quoting *Emp'rs Mut. Cas. Co.*, 618 F.3d at 1159).

has sufficient minimum contacts with the forum and, if so, whether the exercise of such jurisdiction would be reasonable under the circumstances. Because both considerations of the due-process analysis must support specific jurisdiction, if one fails, consideration of the other is unnecessary.

The minimum contacts requirement for specific jurisdiction evaluates "whether the defendant purposefully availed itself of the privilege of conducting activities within the forum State."[28] The "requirement of 'purposeful availment' for purposes of specific jurisdiction precludes personal jurisdiction as the result of 'random, fortuitous, or attenuated contacts.'"[29] Even though it may be foreseeable that a particular product could travel to the forum state, mere foreseeability is not "a sufficient benchmark for personal jurisdiction under the Due Process Clause."[30] As the Supreme Court explains:

> [T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there.[31]

In addition to the purposeful availment requirement, the litigation must "result[ ] from alleged injuries that arise out of or relate to those activities."[32]

In support of their claim that DTNA has sufficient minimum contacts, Plaintiffs primarily

---

[28] *Monge v. RG Petro-Machinery (Group) Co.*, 701 F.3d 598, 613 (10th Cir. 2012) (citing *Benton v. Cameco Corp.*, 375 F.3d 1070, 1076 (10th Cir. 2004)).

[29] *Bell Helicopter Textron, Inc. v. HeliQwest Int'l., Ltd.*, 385 F.3d 1291, 1296 (10th Cir. 2004) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

[30] *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 295 (1980).

[31] *Id.* at 297.

[32] *Intercon, Inc. v. Bell Atl. Internet Sols. Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quoting *Burger King*, 471 U.S. at 472).

rely on a stream-of-commerce theory.[33]  Plaintiffs argue that DTNA has transacted business in

Kansas within the meaning of K.S.A. § 60-308(b)(1)(A) and purposefully directed its activities

toward the forum by intentionally placing its products in the stream of commerce in the Kansas

market by selling them to wholly-owned or authorized dealers which, in turn, sell those products

in Kansas.  Plaintiffs also allege that DTNA has minimum contacts with Kansas because it enters

into contracts, sends written and digital communications, maintains websites, advertises, owns

dealerships, sells trucks and truck parts, provides truck maintenance and repair services,

performs warranty repair, employs Kansas residents, and commits torts in Kansas.

However, the Court need not analyze the factors relevant to minimum contacts under a

stream-of-commerce theory in this case.  Even assuming DTNA's actions indicate an intent to

serve the Kansas market and are "action[s] of the defendant purposefully directed toward the

forum State"[34] sufficient to satisfy the purposeful-direction element of the due-process test,

Plaintiffs have not established that their injuries arise out of DTNA's forum-related activities.

When a defendant has purposefully directed activities at the forum state, courts must then

consider whether a plaintiff's alleged injuries "arise out of" the defendant's forum-related

contacts.[35]  Courts have generally followed one of three approaches in analyzing this "nexus"

requirement: (1) proximate causation, (2) but-for causation, or (3) substantial connection.[36]  The

Tenth Circuit has rejected the substantial-connection approach outright,[37] but has considered the

---

[33] *See, e.g.*, Doc. 36 at 4, 5.

[34] *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 112 (1987).

[35] *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008).

[36] *Id.*

[37] *Id.*

two causation-based approaches without choosing one or the other.[38]  Plaintiffs "satisf[y] the but-for standard if [they] show[ ] the defendant's forum-related activities were an 'event in the causal chain leading to the plaintiff's injury.'"[39]  "The proximate cause standard, 'by contrast, is considerably more restrictive and calls for courts to examine[ ] whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim.'"[40]  Here, the Court need not decide which approach is more appropriate because Plaintiffs have failed to demonstrate the requisite nexus under either.

The relevant facts alleged by Plaintiffs are that DTNA sold the Subject Freightliner to an authorized dealer, and that authorized dealer sold the Subject Freightliner to Indian Creek LLC, which employed Ford who ultimately drove the Subject Freightliner through Kansas at the time of the wreck.  There is no allegation that DTNA sold the Subject Freightliner in Kansas or to a Kansas resident; nor are there any allegations that the design or manufacture of the allegedly defectively designed components of the Subject Freightliner occurred in Kansas, or otherwise bore any relationship to Kansas.  Plaintiffs rely on the fact that the wreck and their respective injuries occurred in Kansas to establish the necessary relationship between DTNA and Kansas.  DTNA contends that none of its relevant conduct—the design, manufacture, and sale—of the Subject Freightliner is alleged to have occurred in Kansas.  Thus, DTNA concludes, this litigation does not arise out of its Kansas contacts, and the Court should not exercise specific jurisdiction.

---

[38] *See id.* at 1078–79; *see also Tomelleri v. MEDL Mobile, Inc.*, 657 F. App'x 793, 796 (10th Cir. 2016) (unpublished); *Newsome v. Gallacher*, 722 F.3d 1257, 1269–70 (10th Cir. 2013); *Emp'rs. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160–61 (10th Cir. 2010).

[39] *Tomelleri*, 657 F. App'x at 796 (quoting *Dudnikov*, 514 F.3d at 1078).

[40] *Id.* (alteration in original) (quoting *Dudnikov*, 514 F.3d at 1078).

Plaintiffs primarily rely on two recent Supreme Court opinions in support of their theory: *Bristol-Myers Squibb Co. v. Superior Court of California* ("*BMS*")[41] and *J. McIntyre Machinery v. Nicastro* ("*Nicastro*").[42]  Neither of these cases, however, compel this Court to exercise specific jurisdiction in the instant case.

In *BMS*, a group of plaintiffs brought suit in California against the manufacturer of the drug Plavix.[43]  Those plaintiffs included both California residents who alleged they purchased and experienced injury from Plavix in California, and nonresidents who purchased and were injured by Plavix elsewhere.[44]  The Supreme Court upheld the exercise of specific jurisdiction over claims brought by the California residents, but found that jurisdiction over the nonresidents did not comport with due process.[45]  In so holding, the Supreme Court reiterated that "[i]n order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'"[46]  In the instant case, Plaintiffs emphasize that the Supreme Court's reasoning in *BMS* turned on the lack of injury felt by the nonresident plaintiffs.  Thus, Plaintiffs conclude, since their injuries occurred in Kansas, that occurrence is sufficient.  But contrary to Plaintiffs' conclusion, *BMS* did not eliminate the requirement that specific jurisdiction requires both that the defendant had contacts with the forum and that the litigation arises out of those contacts.[47]

---

[41] 137 S. Ct. 1773 (2017).

[42] 564 U.S. 873 (2011).

[43] *BMS*, 137 S. Ct. at 1778.

[44] *Id.*

[45] *Id.* at 1781–82.

[46] *Id.* at 1781 (quoting *Goodyear Dunlop Tires Ops. v. Brown*, 564 U.S. 915, 918 (2011)).

[47] *See, e.g.*, *Old Repub. Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895 (10th Cir. 2017) (imposing a nexus requirement for specific jurisdiction following the Supreme Court's decision in *BMS*).

Plaintiffs also rely on *Nicastro*, a Supreme Court case that failed to produce a majority opinion. In that case, the Supreme Court found no specific jurisdiction where the defendant manufactured the defective product outside the forum.[48] In support of specific jurisdiction, the plaintiff cited the defendant's contractual relationship with U.S. distributors, the defendant's attendance at U.S. trade shows in states other than the forum, and the fact that at least one of the defendant's defective products ended up in the forum.[49] A plurality of the Supreme Court clarified that "[a] person may submit to a State's authority in a number of ways," including "explicit consent . . . [p]resence within a State at the time suit commences through service of process . . . [c]itizenship or domicile—or, by analogy, incorporation or principal place of business for corporations[,]" each of which would permit a State to exercise *general* jurisdiction.[50] The plurality added that specific jurisdiction is "a more limited form of submission to a State's authority for disputes that 'arise out of or are connected with the activities within the state.'"[51] Said differently, any exercise of specific jurisdiction must be based on DTNA's suit-related contacts with Kansas. Plaintiffs have not established any nexus because they have not shown that DTNA's Kansas-related activities were an event in the causal chain leading to Plaintiffs' injury. Because Plaintiffs have not identified any suit-related activity conducted by DTNA in Kansas, the Court does not have specific jurisdiction over DTNA.

Plaintiffs also allege that this Court may exercise specific personal jurisdiction over DTNA based on the alleged commission of tortious acts that caused injury to Plaintiffs in Kansas within the meaning of K.S.A. § 60-308(b)(1)(B), resulting in harmful effects felt in Kansas.

---

[48] *Nicastro*, 564 U.S. at 878.

[49] *Id.* at 886.

[50] *Id.* at 880–81.

[51] *Id.* at 881 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

Although "[a]n injury occurring in Kansas as a result of tortious activity outside the state is considered a tortious act within the state for purposes of personal jurisdiction,"[52] Plaintiffs still must allege sufficient facts to show purposeful direction.

In the intentional tort context, courts apply the "effects test" set forth in *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*[53] to evaluate whether a defendant purposefully directed its suit-related activities at the forum. That test, derived from the Supreme Court's decision in *Calder v. Jones*,[54] allows a plaintiff to establish purposeful direction by showing that the defendant took an intentional action that was expressly aimed at the forum state with knowledge that the brunt of the injury would be felt in the forum state.[55]

In addition, this Court agrees with the analysis of Judge Melgren that:

> [The *Calder* effects] test requires "more than simply harm suffered by a plaintiff who resides in the forum state." Indeed, "the plaintiff cannot be the only link between the defendant and the forum." Rather, the defendant's conduct must connect the defendant "to the forum in a meaningful way." "[M]ere foreseeability of causing an injury in the forum state is . . . insufficient."[56]

Here, Plaintiffs bring a negligence-based claim and a strict liability claim based on the design of the Subject Freightliner. Plaintiffs' negligence claim states that DTNA "had a duty to design, test, manufacture and market its trucks, including the Subject Freightliner, in a manner which prevented or mitigated foreseeable front-end collisions," and that DTNA "breached [its] duty" because it did not "equip[ ] the [S]ubject Freightliner with FCW and AEB," which a

---

[52] *Bank of Blue Valley v. Lasker Kim & Co. LLP*, Case No. 15-9303-CM, 2016 WL 3881336, at *3 (D. Kan. July 18, 2016) (citing *Thermal Components Co. v. Griffith*, 98 F. Supp. 2d 1224, 1227–28 (D. Kan. 2000)).

[53] 514 F.3d 1063, 1072 (10th Cir. 2008).

[54] 465 U.S. 783 (1984).

[55] *Dudnikov*, 514 F.3d at 1072.

[56] *Heffington v. Puleo*, Case No. 17-1192-EFM, 2018 WL 690995, at *5 (D. Kan. Feb. 2, 2018) (first alteration added) (citations omitted).

company of ordinary prudence would have "done under the same or similar circumstances."[57] Plaintiffs' strict product liability claim states that the "Subject Freightliner contained defects in the design, manufacture, testing, and warnings" because it "lacked a Forward Collision Warning . . . system and an Automatic Emergency Braking . . . system for crash prevention or crash mitigation and Defendants failed to provide any warning on the risks associated with [this] failure[.]"[58]  In the Tenth Circuit, the effects test is satisfied only where allegations suggest that the defendant intended to cause injury, or cause consequences that the defendant knew would lead to injury, in the forum state.[59]  Notably, the Tenth Circuit has not extended the "harmful effects" theory of purposeful direction to cases involving unintentional torts such as negligent design defect and strict product liability.[60]

Even assuming that the "harmful effects" framework did apply to unintentional torts, the Supreme Court has clarified that a plaintiff seeking to establish specific jurisdiction must show more than mere harm suffered by a plaintiff residing in the forum state.[61]  Plaintiffs have failed to allege that DTNA targeted its allegedly defective products to Kansas, or that the design and manufacture of those products bore any relationship to Kansas.  In sum, Plaintiffs have not demonstrated that this Court has specific personal jurisdiction over DTNA.

---

[57] Doc. 36 at 13.

[58] *Id.* at 12.

[59] *See Old Repub. Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 907 (10th Cir. 2017) ("Purposeful direction may also be established . . . when an out-of-state defendant's intentional conduct targets and has substantial harmful effects in the forum state." (citing *Calder v. Jones*, 465 U.S. 783, 790–91 (1984))); *Speedsportz, LLC v. Menzel Motor Sports, Inc.*, Case No. 07-CV-624-TCK-TLW, 2009 WL 2921295, at *9 (N.D. Okla. Sept. 8, 2009) ("[C]ourts have held that *Calder*'s 'effects test' has no application to negligence claims." (citations omitted)).

[60] *See Old Repub. Ins. Co.,* 877 F.3d at 916 n.34.

[61] *Walden v. Fiore*, 571 U.S. 277, 289–90 (2014).

## 2. General Jurisdiction

Plaintiffs also allege that this Court has general jurisdiction over DTNA because DTNA has substantial, systemic, continuous contact with the State of Kansas, and because DTNA is registered to do business in Kansas.

### a. Legal Standard

General personal jurisdiction permits a court to exercise power over a corporate defendant in "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."[62] "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test[.]"[63] For a corporate defendant, paradigmatic bases for the exercise of general jurisdiction include the defendant's place of incorporation and the principal place of business.[64] General jurisdiction in a forum other than the defendant's place of incorporation or principal place of business will exist only in "exceptional case[s]" where the defendant's operations in the forum are "so substantial and of such a nature as to render the corporation at home in that State."[65] In contrast with specific jurisdiction, when a court finds that it has general personal jurisdiction over the defendant, that finding concludes the due-process inquiry and the defendant is subject to suit in the forum state for claims both with and without any connection to the state.[66]

---

[62] *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)).

[63] *Old Repub. Ins. Co.*, 877 F.3d at 903 (quoting *Benton v. Cameco Corp.*, 375 F.3d 1070, 1080 (10th Cir. 2004)).

[64] *Id.* at 137.

[65] *Id.* at 139 n.19.

[66] *Id.* at 139 n.20 (explaining that the "multipronged reasonableness check" is to be used "when specific jurisdiction is at issue," and stating that "[w]hen a corporation is genuinely at home in the forum State . . . any

Finally, "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."[67]  The Supreme Court has noted that "because the personal jurisdiction requirement is a waivable right, there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'"[68]  A defendant may consent to personal jurisdiction explicitly, such as through a "forum selection clause or some other agreement,"[69] or implicitly "through its actions, for example, by appearing in court and arguing the merits of the case."[70]  "Whether such surrender of a personal immunity be conceived negatively as a waiver or positively as a consent to be sued, is merely an expression of literary preference."[71]  In any context, the relinquishment of a constitutional right "must, at the very least, be clear."[72]

### b. Analysis

Here, Plaintiffs assert two bases for general jurisdiction over DTNA: (1) DTNA's substantial, systemic, continuous contacts with Kansas, and (2) DTNA's consent to such jurisdiction through its registration to do business in Kansas.  DTNA contends that its contacts with Kansas are not sufficient to confer general jurisdiction because those contacts do not render it "at home" in the state, nor is DTNA incorporated or headquartered in Kansas.  DTNA also

---

second-step [reasonableness] inquiry would be superfluous" (citing *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 113–14 (1987))).

[67] *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).

[68] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (quoting *Ins. Corp. of Ireland*, 456 U.S. at 703); *see also Travelers Cas. & Surety Co. of Am. v. Unistar Fin. Serv. Corp.*, 35 F. App'x 787, 789 (10th Cir. 2002) (citing *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979)).

[69] *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755, 766 (Fed. Cir. 2016) (O'Malley, J., concurring) (citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964)), *cert. denied*, 137 S. Ct. 625 (2017).

[70] *Id.* (citing *Ins. Corp. of Ireland*, 456 U.S. at 703).

[71] *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939).

[72] *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972).

argues that registering to do business in Kansas does not confer general jurisdiction over it because to do so would be inconsistent with due process.

The Court first agrees with DTNA that Plaintiffs fail to make specific allegations establishing that DTNA is subject to general personal jurisdiction in Kansas on the basis of its "substantial, systemic and continuous" business activities within the state. To find any defendant subject to the general personal jurisdiction of this Court because it sells its products through a network of authorized dealers including dealers in Kansas, as DTNA allegedly does, would be "unacceptably grasping" under the Supreme Court's reasoning in *Daimler AG v. Bauman*.[73] At best, Plaintiffs have demonstrated that DTNA conducts some business in Kansas on a regular basis, including owning property through a wholly-owned subsidiary, maintaining dealerships, entering contracts, and providing maintenance and repair services in the forum. But these contacts do not constitute an exceptional case rendering DTNA at home in Kansas.[74] The Court therefore cannot exercise personal jurisdiction on this basis.

Plaintiffs also contend that DTNA is subject to general personal jurisdiction in Kansas because DTNA is registered to do business in Kansas. Plaintiffs reason that foreign corporations seeking to do business in Kansas must first register with the Kansas Secretary of State, and that such registration amounts to constitutionally valid, express consent to jurisdiction in the forum.

K.S.A. § 17-7931 provides that "[b]efore doing business in the state of Kansas, a foreign covered entity shall register with the secretary of state." Subsection (g) of that statute elaborates that, in order to register, a foreign covered entity must submit the following to the secretary of state:

---

[73] 571 U.S. 117, 138 (2014).

[74] *Id.* at 139 n.19 (citation omitted).

> an irrevocable written consent of the foreign covered entity that actions may be commenced against it in the proper court of any county where there is proper venue by the service of process on the secretary of state as provided for in K.S.A. § 60-304, and amendments thereto, and stipulating and agreeing that such service shall be taken and held, in all courts, to be as valid and binding as if due service had been made upon the governors of the foreign covered entity.[75]

DTNA does not dispute that it is registered to do business in Kansas. Instead, it argues that consent-by-registration cannot be a constitutionally acceptable form of general jurisdiction in light of the Supreme Court's decision in *Daimler AG*. In a case decided late last year,[76] this Court joined three other District of Kansas judges in holding that consent-by-registration did survive *Daimler AG*.[77] Notwithstanding these holdings, DTNA suggests that such a determination was erroneous and urges this Court to revisit its prior holding. The Court declines to do so.

As discussed at length in *Freedom Transportation, Inc. v. Navistar International*,[78] the Tenth Circuit has not addressed whether the Kansas business registration statute constitutionally confers general personal jurisdiction in Kansas over a defendant who is registered to do business in the forum.[79] However, the Tenth Circuit has historically followed the practice of determining whether a foreign corporation's registration to do business constitutes consent by reference to the

---

[75] K.S.A. § 19-7931(g).

[76] *Freedom Tranps., Inc. v. Navistar Int'l Corp.*, Case No. 2:18-cv-2603-JAR-KGG, 2019 WL 4689604 (D. Kan. Sept. 26, 2019).

[77] *In re: Syngenta*, 2016 WL 1047996, at *2; *Snyder Ins. Servs., Inc. v. Sohn*, Case No. 16-CV-2535-DDC-GLR, 2016 WL 6996265, at *3–4 (D. Kan. Nov. 30, 2017); *AK Steel Corp. v. PAC Operating Ltd. P'ship*, Case No. 2:15-CV-09260-CM-GEB, 2017 WL 3314294, at *3–4 (D. Kan. Aug. 3, 2017).

[78] 2019 WL 4689604.

[79] *But see Travelers Fire Ins. Co. v. Ranney-Davis Mercantile Co.*, 173 F.2d 844, 846–49 (10th Cir. 1949) (finding no sound reason why a state should not have the power to compel foreign corporations seeking to do business in the state to submit to the jurisdiction of the state for all controversies arising between the corporation and citizens of the state).

state statute governing such issue or, in some instances, case law construing that statute.[80]

Accordingly, binding circuit precedent directs this Court to look to Kansas law to determine whether the business registration statute provides a basis for jurisdiction over registered corporations.[81] The Kansas Supreme Court's most recent decision on the issue, *Merriman v. Crompton Corp.*, held that the foreign corporation registration statute also required those foreign corporations to expressly consent to general personal jurisdiction.[82] In so holding, the Kansas Supreme Court noted that "[m]any courts have recognized that such consent statutes provide a basis for exercising general jurisdiction"[83] because "although parties may not waive subject matter jurisdiction, they may waive personal jurisdiction."[84]

Though DTNA asserts that *Daimler AG* "substantially narrowed the reach of general personal jurisdiction such that a corporate defendant will normally only be subject to general jurisdiction in its place of incorporation and principle [sic] place of business,"[85] the Court is unpersuaded that *Daimler AG* is inconsistent with general jurisdiction based on consent-by-

---

[80] *See, e.g.*, *Budde v. Kentron Hawaii, Ltd.*, 565 F.2d 1145, 1147–49 (10th Cir. 1977) (relying on Colorado law, and specifically opinions from the Colorado Supreme Court and the Colorado Court of Appeals, that the statute constituted consent to general personal jurisdiction); *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1036 (10th Cir. 1975) (relying on language of New Mexico statute and affording "great weight and credence" to the trial court's interpretation of the statute, based on unsettled New Mexico law, that the statute did not confer general personal jurisdiction).

[81] *See In re: Syngenta AG MIR 162 Corn Litigation*, MDL No. 2591, Case No. 14-md-2591-JWL, 2016 WL 1047996, at *1 (D. Kan. Mar. 11, 2016) (citing *Robert Mitchell Furniture Co. v. Selden Breck Constr. Co.*, 257 U.S. 213, 214–16 (1921) (state's construction of its own statute determines the effect of registration).

[82] 146 P.3d 162, 171 (Kan. 2006) (interpreting K.S.A. § 17-7301, the predecessor statute to the substantively indistinguishable current statute, K.S.A. § 17-7931(g)).

[83] *Id.* at 170 (collecting cases).

[84] *Id.* at 171 (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)).

[85] Doc. 20-3 at 19.

registration.[86]  In addition to the authoritative weight of the Kansas Supreme Court's decision in *Merriman*, which has not been overturned, DTNA made a choice to register to do business in Kansas knowing that in so doing, "it [took] the risk of the interpretation that may be put upon it by the courts."[87]  Further, DTNA has maintained its registration to do business in Kansas even following the Kansas Supreme Court's decision in *Merriman*.  Consequently, DTNA has consented to general personal jurisdiction in Kansas.

Additionally, because a "state court's assertion of jurisdiction exposes defendants to the State's coercive power," such an assertion is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause."[88]  This determination is a question of federal law.[89]  As this Court has previously held, the Kansas business registration statute comports with due process.[90]  Accordingly, based on DTNA's registration to do business in the Kansas, this Court has consent-based general personal jurisdiction over it.

---

[86] Additionally, the Court notes that in *Daimler AG*, the Supreme Court only mentioned consent jurisdiction when differentiating precedent discussing the requirements for general jurisdiction from cases in which the defendant had "consented to suit in the forum."  *Daimler AG v. Bauman*, 571 U.S. 117, 129 (2014).

[87] *Pennsylvania Fire Ins. Co. v. Gold Issue Mining Co.*, 243 U.S. 93, 96 (1917).

[88] *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 918–19 (2011) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[89] *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 626 (2d Cir. 2016) ("If the state has purported to exercise jurisdiction over the foreign corporation, then the question may arise whether such attempt violates the due process clause or the interstate commerce clause of the federal constitution. This is a federal question and, of course, the state authorities are not controlling. But it is a question that is not reached for decision until it is found that the State statute is broad enough to assert jurisdiction over the defendant in a particular situation." (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 222 (2d Cir. 1963))).

[90] *Freedom Tranps., Inc. v. Navistar Int'l Corp.*, Case No. 2:18-cv-2603-JAR-KGG, 2019 WL 4689604 (D. Kan. Sept. 26, 2019).  The Court also notes that, since the Supreme Court's decision in *Daimler AG*, the Tenth Circuit has not addressed whether the Kansas business registration statute constitutionally confers general personal jurisdiction in Kansas over defendants who register to do business in the forum; nor has the Tenth Circuit addressed the constitutionality of any other state's business registration statute.

### B. Preemption and Separation of Powers

DTNA also argues that all claims against it should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiffs' claims are preempted by federal law or barred from judicial determination based on the separation of powers doctrine.

### 1. Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, when assumed to be true, "raise a right to relief above the speculative level"[91] and must include "enough facts to state a claim to relief that is plausible on its face."[92] Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[93] The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[94] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[95] Finally, courts must accept the nonmoving party's factual allegations as true and may not dismiss on grounds that it appears unlikely the allegations can be proven.[96]

The Supreme Court has explained the analysis as a two-step process. For purposes of a motion to dismiss, a court "must take all the factual allegations in the complaint as true, [but is]

---

[91] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004)).

[92] *Id.* at 570.

[93] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[94] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 557).

[95] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[96] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

'not bound to accept as true a legal conclusion couched as a factual allegation.'"[97]  Thus, courts must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[98]  Second, courts  must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[99]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[100]

When ruling on a motion to dismiss, if "a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'"[101]  There are three exceptions to this rule: (1) documents that the complaint incorporates by reference,[102] (2) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,"[103] and (3) "matters of which a court may take judicial notice."[104]  Courts are "permitted to take judicial notice of [their] own files and records, as well as facts which are a

---

[97] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[98] *Id.* at 678–79.

[99] *Id.* at 679.

[100] *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

[101] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Alexander v. Okla.*, 382 F.3d 1206, 1214 (10th Cir. 2004)).

[102] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[103] *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

[104] *Tellabs*, 551 U.S. at 322.

matter of public record."[105]  This includes contents of the Federal Register, which "shall be judicially noticed[.]"[106]

Generally, preemption is an affirmative defense and the defendant bears the burden of proof.[107]  "A district court may grant judgment as a matter of law under Federal Rule of Civil Procedure 12(b)(6) on the basis of an affirmative defense like preemption when the law compels that result."[108]  A motion to dismiss premised on an affirmative defense is only proper "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements."[109]

### 2.    Preemption Analysis

DTNA argues that the federal statutory and regulatory scheme surrounding Class Eight trucks and FCW/AEB systems preempt Plaintiffs' common law claims.  DTNA relies on the National Traffic and Motor Vehicle Safety Act, the Federal Motor Vehicle Safety Standards, the Federal Motor Carrier Safety Regulations, and pending agency rulemaking in support of its preemption argument.  Article VI of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[110]  As a result of the supremacy of federal law,

---

[105] *Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001).

[106] 44 U.S.C. § 1507.

[107] *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1351 (10th Cir. 2015).

[108] *Id.* at 1341.

[109] *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

[110] U.S. Const. Art. VI, Cl. 2; *see also Choate v. Champion Home Builders Co.*, 222 F.3d 788, 791 (10th Cir. 2000).

state laws—including common law and statutory law—that conflict with federal law are without effect.[111]  "Pre-emption fundamentally is a question of congressional intent[.]"[112]

Preemption may either be express or implied.[113]  Whether express or implied, a preemption inquiry typically "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."[114]  Express preemption occurs where a federal law or regulation "define[s] explicitly the extent to which its enactments pre-empt state law."[115]  Implied preemption includes both field preemption and conflict preemption.  Implied field preemption occurs where "the scope of a statute indicates that Congress intended federal law to occupy a field exclusively."[116]  Conflict preemption is further categorized as either impossibility preemption, where it is "impossible for a private party to comply with both state and federal requirements,"[117] or obstacle preemption, where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[118]

Both forms of implied conflict preemption—impossibility and obstacle—require an actual conflict between state and federal law.  This type of preemption may arise even where Congress has not completely displaced state regulation in a particular area.[119]  Federal statutes

---

[111] *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1128–29 (10th Cir. 2007).

[112] *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990).

[113] *Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1198 (10th Cir. 2018).

[114] *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[115] *Emerson*, 503 F.3d at 1129 (quoting *Choate*, 222 F.3d at 792).

[116] *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002) (internal quotations and citations omitted).

[117] *Emerson*, 503 F.3d at 1129 (quoting *Sprietsma*, 537 U.S. at 64).

[118] *Id.*

[119] *Fid. Fed. Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982).

and federal regulations are equally preemptive.[120]  Additionally, both state statutes and state common law claims that conflict with federal regulations may be preempted.[121]

Here, DTNA has not argued that any federal statute or regulation expressly preempts Plaintiffs' claims; nor has DTNA asserted that Plaintiffs' claims are subject to dismissal based on impossibility or field preemption.  DTNA's preemption argument is focused wholly on implied obstacle preemption—that is, DTNA argues that Plaintiffs' "common-law tort claims . . .  present an obstacle to the purposes and objectives of a federal law or regulation."[122]  More specifically, DTNA asserts that the combination of the Safety Act, Safety Standards, and Safety Regulations preempt Plaintiffs' claims because at the time the Subject Freightliner was designed and manufactured, no federal statute or agency had set formal equipment standards regarding FCW/AEB; and, that inaction reflects a legislative or regulatory desire to advance some federal objective.  Plaintiffs respond that "neither the [Safety Standards] nor the [Safety Regulations] address, much less prohibit, heavy truck manufacturers from equipping trucks with safety technology like FCW and AEB."[123]  Plaintiffs argue that where both Congress and an agency are silent about regulating a specific piece of equipment, that silence does not have preemptive force except where a clear legislative or regulatory reason for the failure to act is provided.

In 1966, Congress passed the Safety Act, which delegated authority to the U.S. Department of Transportation ("DOT") to "prescribe motor vehicle safety standards" and "carry out needed safety research and development."[124]  In turn, DOT delegated this authority to the

---

[120] *Id.* at 153; *Kansas ex rel. Todd v. United States*, 995 F.2d 1505, 1509 (10th Cir. 1993).

[121] *Sprietsma*, 537 U.S. at 63.

[122] Doc. 20-3 at 8.

[123] Doc. 22-1 at 5.

[124] Pub. L. No. 89-563, 80 Stat. 718 (1966) (recodified as amended at 49 U.S.C. § 30101 *et seq.*).

National Highway and Traffic Safety Administration ("NHTSA").[125]  The stated objectives of the NHTSA include saving lives, preventing injuries, and reducing economic costs resulting from road traffic crashes through education, research, safety standards, and other enforcement activity.[126]

The Safety Act includes a preemption clause, which provides that states may establish "a [safety] standard applicable to the same aspect of performance . . . only if the standard is identical to the [federal safety] standard."[127]  The Safety Act also contains a saving clause, which provides that "[c]ompliance with a [federal] motor vehicle safety standard . . . does not exempt a person from liability at common law."[128]   In a case dealing with similar statutory language, the Supreme Court held that "'the presence of [a] saving clause' makes clear that Congress intended state tort suits to fall outside the scope of the express pre-emption clause."[129]  However, the presence of a "saving clause does not foreclose or limit the operation of 'ordinary conflict pre-emption principles, grounded in longstanding precedent.'"[130]

In 2010, the NHTSA "began a thorough examination of the state of forward-looking advanced braking technologies."[131]  This included analysis of AEB/FCW performance, "and identifying areas of concern or uncertainty, in an effort to better understand their potential."[132]

---

[125] 49 C.F.R. § 1.95(a).

[126] *NHTSA's Core Values*, National Highway Traffic Safety Administration, www.nhtsa.gov/about-nhtsa/nhtsas-core-values (last visited Jan. 6, 2020).

[127] 49 U.S.C. § 30103(b).

[128] 49 U.S.C. § 30103(e).

[129] *Williamson v. Mazda Motor of Am.*, 562 U.S. 323, 329 (2011) (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000)).

[130] *Id.* at 329 (quoting *Geier*, 529 U.S. at 874).

[131] *Advanced Braking Technologies that Rely on Forward-Looking Sensors; Request for Comments*, 77 Fed. Reg. 39561, 39562 (July 3, 2012).

[132] *Id.*

NHTSA has continuously collected data and qualitative information about AEB/FCW systems, engaged in discussions with industry stakeholders, evaluated methods to test these systems, and considered performance and assessment criteria.[133]  By 2012, NHTSA determined that AEB and FCW "show promise for enhancing vehicle safety by helping drivers to avoid crashes or mitigate the severity and effects of crashes."[134]  Consequently, NHTSA began "soliciting comments on the results of its research thus far to help guide" the agency's "continued efforts in this area."[135]

In 2015, NHTSA granted a petition for rulemaking to "establish a safety standard to require automatic forward collision avoidance and mitigation systems on certain heavy vehicles," which may include Class Eight trucks such as the Subject Freightliner.[136]  This grant followed years of research, testing, and implementing similar technologies in lighter weight vehicles.[137]  During this process, NHTSA announced its desire to "improve vehicle safety" and "incentivize the installation of these [AEB/FCW] technologies in a way that allows for continued innovation and technological advancement."[138]  NHTSA added that before issuing a final rule, it wanted to test next generation systems for vehicles between 10,000 and 26,000 pounds, and allow the industry to produce more systems for trucks exceeding 26,000 pounds.[139]  As both parties note, the NHTSA has not yet concluded its pending rule-making process.  Additionally, NHTSA has

---

[133] *Id.*; *see also Federal Motor Vehicle Safety Standard; Automatic Emergency Braking*, 82 Fed. Reg. 8391–94.

[134] *Federal Motor Vehicle Safety Standard; Automatic Emergency Braking*, 82 Fed. Reg. 8392.

[135] *Id.*

[136] *Federal Motor Vehicle Safety Standard; Automatic Emergency Braking*, 80 Fed. Reg. 62487-01. (Oct. 16, 2015).

[137] *See Federal Motor Vehicle Safety Standard; Automatic Emergency Braking*, 82 Fed. Reg. 8394.

[138] *Federal Motor Vehicle Safety Standard; Automatic Emergency Braking*, 82 Fed. Reg. 8391.

[139] *Federal Motor Vehicle Safety Standard; Automatic Emergency Braking*, 80 Fed. Reg. 62487-01.

explicitly stated that its current, pending rulemaking regarding AEB/FCW may result in no regulatory action whatsoever.

Based on the foregoing regulatory history, DTNA concludes that NHTSA has expressed a federal regulatory objective; and allowing Plaintiffs to pursue their negligence-based and strict liability-based design defect claims would undermine that objective. DTNA relies primarily on a recent state appellate court case, *Dashi v. Nissan North America, Inc.*,[140] in support of its argument. That case involved a car wreck between the plaintiff's vehicle and a light weight passenger vehicle manufactured by Nissan. The plaintiff argued that Nissan should have installed FCW/AEB systems in the vehicle, and the failure to do so rendered the vehicle unreasonably dangerous and defective. In its motion for summary judgment, Nissan relied on a similar preemption argument to the one that DTNA makes here. The Arizona Court of Appeals ultimately granted summary judgment on preemption grounds, reasoning that the plaintiff's tort claims "would represent an obstacle to NHTSA's achievement of a significant regulatory objective."[141] The state court's reasoning in *Dashi*, however, is neither binding authority nor persuasive in light of this Court's review of U.S. Supreme Court precedent.

The Court finds *Sprietsma v. Mercury Marine*[142] to be particularly instructive. In that case, the plaintiff sued a boat's engine designer following a boating accident in which the decedent was struck by the boat's propeller.[143] The plaintiff alleged, among other things, that the boat was unreasonably dangerous because it did not have a propeller guard.[144] The lower courts

---

[140] 445 P.3d 13 (Ariz. Ct. App. 2019).

[141] *Id.* at 21.

[142] 537 U.S. 51 (2002).

[143] *Id.* at 54–55.

[144] *Id.* at 55.

all found the plaintiff's claims were preempted by the Federal Boat Safety Act ("FBSA") and the Coast Guard's regulatory authority promulgated thereunder.[145]  The Supreme Court reversed, holding that the plaintiff's common law state tort claims—including the design defect claims— were not preempted by the FBSA or any other federal law or regulation.[146]  The defendant relied on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats.[147]  The Supreme Court made clear that "[i]t is quite wrong to view th[e] decision" not to adopt a regulation requiring propeller guards "as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation."[148] The Court reached such a conclusion even though the Coast Guard had conducted significant research into propeller guards and made an "undoubtedly intentional and carefully considered" decision not to implement a regulation.[149]  Because the Coast Guard's explanation for its decision not to promulgate a rule "d[id] not convey an 'authoritative' message of a federal policy against propeller guards," that decision was not given preemptive effect.[150]

The arguments made by the defendant in *Sprietsma* closely track the arguments DTNA makes here.  DTNA relies on the NHTSA's decision not to promulgate any rules or regulations requiring FCW or AEB systems on Class Eight trucks to argue that common law tort claims premised on the failure to manufacture trucks with such systems are preempted.  DTNA argues that NHTSA's 2015 Notice of Proposed Rulemaking and 2012 Request for Comment express an agency determination that FCW/AEB systems, at those respective times, were better left

---

[145] *Id.*

[146] *Id.* at 64–68.

[147] *Id.* at 65.

[148] *Id.* at 65.

[149] *Id.* at 67.

[150] *Id.*

unregulated.  These publications from NHTSA, however, do not make such a determination.  The 2015 NOPR does not make *any* authoritative statement of a federal policy against FCW/AEB systems.  In fact, the 2015 NOPR expresses that the technology has potential to enhance safety and benefit drivers.  And the 2012 RFC merely summarizes the NHTSA's research to that point, and notes that the decision to not issue a regulation mandating such systems is due, at least in part, to the state of the technology at that time and a need to refine the performance criteria to assess FCW/AEB systems.  Nothing in either of these publications express an authoritative decision by the NHTSA from which the Court should infer obstacle preemption.

DTNA also relies on two other Supreme Court opinions—*Geier v. American Honda Motor Company*[151] and *Williamson v. Mazda Motor of America*,[152]—in support of its preemption claim.  But neither of these cases supports a determination in the instant case that Plaintiffs' claims are preempted.

*Geier* involved the use of passive restraints—such as airbags, automatic seatbelts, and ignition locks if manual seatbelts were unfastened—in light vehicles.[153]  DOT had promulgated a regulation setting out a time frame for all light vehicles to have some form of passive restraint system installed.[154]  The car involved in a fatal crash complied with the federal regulation but did not have driver's side airbags.[155]  The Supreme Court held that the plaintiff's state law products liability claims were preempted, reasoning that DOT had made a deliberate decision, supported

---

[151] 529 U.S. 861 (2000).

[152] 562 U.S. 323 (2011).

[153] *Geier*, 529 U.S. at 875–76.

[154] *Id.*

[155] *Id.* at 881.

by the administrative record, to leave manufacturers with a choice between a variety of passive restraints.[156]

*Williamson* involved the design of seatbelts in vehicles' rear inner seats. There, a federal standard allowed manufacturers to choose between installing two-point restraints that were simple lap-only seatbelts or three-point restraints that spanned the occupant's lap and one shoulder.[157] DOT had made an intentional determination and explained that it was best to permit vehicle manufacturers to choose whether to install two-point or three-point restraints primarily because it would be a more cost-effective way to ensure some type of restraint was installed in the rear inner seats.[158] The defendant manufacturer had opted for a two-point restraint on its rear inner seats, in compliance with the federal regulation.[159] The vehicle was in a head-on collision, and the passenger buckled in the rear inner seat died.[160] In the resulting lawsuit, the Supreme Court ultimately held that the plaintiff's state law tort claims for the defective design on the two-point rear inner seat restraint were not preempted by federal law because DOT's decision to "provid[e] manufacturers with this seatbelt choice is not a significant objective of federal regulation."[161]

*Geier* and *Williamson* instruct courts to consider an agency's reasoning for implementing a regulation; if the reason is not tied to a significant regulatory objective, even compliance with a federal regulation is not sufficient to insulate a manufacturer from state law tort claims based on

---

[156] *Id.* at 886.

[157] *Williamson v. Mazda Motor of Am.*, 562 U.S. 323, 333–34 (2011).

[158] *Id.* at 335.

[159] *Id.* at 326–27.

[160] *Id.*

[161] *Id.* at 326. The Supreme Court also described prior DOT consideration of rear inner seat restraints and cited to the Solicitor General's statement that the Government did not believe DOT's regulation preempted the plaintiff's claims. *Id.* at 332–36.

a vehicle's design. In the instant case, NHTSA did not provide Class Eight truck manufacturers with a choice between different crash-mitigation technologies, instead opting not to issue any final rule requiring or prohibiting such systems. On this record, the Court is not convinced that NHTSA's actions reflect a federal regulatory objective sufficient to trigger implied obstacle preemption. Instead, as the Supreme Court found in *Sprietsma*, NHTSA's inaction does not convey any authoritative message of a federal policy against FCW or AEB systems. Accordingly, Plaintiffs' claims are not preempted.

### 3.    Separation of Powers Analysis

Finally, DTNA argues that Plaintiffs' claims violate the separation of powers doctrine. It contends that "[a]llowing a jury to decide whether the lack of FCW and AEB features deems a heavy, Class eight truck 'defective' or a manufacturer 'negligent' would result in significant judicial interference with the operations of the legislature."[162] DTNA adds that at the federal and state level, the legislature has vested authority in administrative agencies "to regulate the commercial trucking industry."[163] According to DTNA, permitting this lawsuit to proceed would "significantly interfere with the legislature, requiring a Kansas jury to second-guess and potentially contradict" yet-unprovided agency guidance on the issue.[164]

This argument is without merit. DTNA cites no authority, and the Court has uncovered none, to support DTNA's assertion. As the Supreme Court reasoned in *Sprietsma*, where an agency has not yet decided to regulate a particular safety feature, the lack of regulation "le[aves] the law applicable to [the safety feature] exactly the same as it had been before" the agency

---

[162] Doc. 20-3 at 12.

[163] *Id.*

[164] *Id.* at 13.

began investigating and researching that feature.[165]  Here, NHTSA has not even decided whether it will promulgate any guidance regarding FCW and AEB systems.  If it were to do so, that regulation would not change the law applicable to the Subject Freightliner, which was designed and manufactured prior to any final agency rule or regulation.[166]  Moreover, the federal statute giving regulatory authority to DOT and NHTSA—the Safety Act—explicitly states that "[c]ompliance with a [federal] motor vehicle safety standard . . . does not exempt a person from liability at common law."[167]  The separation of powers doctrine, therefore, does not bar Plaintiffs' claims.

## III.  Conclusion

The Court finds that it has personal jurisdiction over DTNA because it registered to do business in the state of Kansas, and the exercise of the same does not offend due process.  The Court also finds that neither implied obstacle preemption nor the separation of powers doctrine prevents Plaintiffs' claims from proceeding.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant DTNA's Motion to Dismiss (Doc. 20) is **denied**.

**IT IS SO ORDERED.**

Dated: January 10, 2020

---

[165] *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002).

[166] *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.").  Although this rule is not without exception, the Supreme Court has cautioned that "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant."  *Id.* at 208–09. Here, DTNA has not argued that NHTSA would have such authority with respect to its pending rulemaking.

[167] 49 U.S.C. § 30103(e).

s/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE