IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**DAMIAN BUTLER,** Individually, as
Administrator of the Estate of Teresa Butler and
O/B/O the Heirs-at-law of Teresa Butler,
Deceased; **ALEXANDER P. COHEN, GERALD
Y. COHEN and WILLIAM E. COHEN**,
Individually and O/B/O the Heirs-at-law of
Sheldon H. Cohen, Deceased; **ALEXANDER P.
COHEN, GERALD Y. COHEN and WILLIAM
E. COHEN**, Individually and O/B/O the Heirs-at-
law of Virginia Cohen, Deceased; **NICOLE
GATES,** as Next Friend of M.G., Minor and Heir-
at-law of Ricardo Mireles, Deceased; **ALISHA
MIRELES,** Individually, and as Next Friend of
T.M., Minor, as Heirs-at-law of Ricardo Mireles,
Deceased; **TERRIE MYERS**, as Next Friend of
L.M, Minor and Heir-at-law of Ricardo Mireles,
Deceased; and **DIANE M. SANFORD,**
Individually, as the Administrator of the Estate of
Karen Kennedy and O/B/O the Heirs-at-law of
Karen L. Kennedy, Deceased,

     **Plaintiffs,**

     **v.**

**DAIMLER TRUCKS NORTH AMERICA,
LLC,**

     **Defendant.**

Case No. 19-CV-2377-JAR

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs Damian Butler, Alexander Cohen, Gerald Cohen, William Cohen, Nicole

Gates, Alisha Mireles, Terrie Myers, and Diane Sanford bring this product liability action related

to a fatal, multivehicle accident involving a Freightliner semi-truck trailer manufactured by

Defendant Daimler Trucks North America, LLC ("DTNA").[1]  Plaintiffs allege that the truck was defective in design due to the absence of collision mitigation technology and that DTNA failed to adequately warn of the dangers associated with failing to have such available technology. Before the Court is DTNA's Motion for Summary Judgment (Doc. 117).[2]  The matter is fully briefed and the Court is prepared to rule.  For the reasons explained below, the Court grants DTNA's motion.

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

---

[1] The Court dismissed Defendant Daimler AG for lack of personal jurisdiction on August 18, 2020.  Doc. 75.

[2] The court granted the parties' joint motion to stay all remaining deadlines in the Second Amended Scheduling Order pending a ruling on Defendant's summary judgment motion, including discovery and the trial date.  Doc. 116.

[3] Fed. R. Civ. P. 56(a).

[4] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[5] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[6] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[8]  Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[13]  A genuine issue of material facts must be supported by "more than a mere scintilla of evidence."[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  "At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences."[16]

---

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[12] *Adler*, 144 F.3d at 671.

[13] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[14] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997).

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[16] *Bacon v. Great Plains Mfg., Inc.*, 958 F. Supp. 523, 526 (D. Kan. 1997) (citation omitted).

## II.     Uncontroverted Facts

The following material facts are either uncontroverted or viewed in the light most favorable to Plaintiffs as the parties opposing summary judgment.[17]  The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented.  Nor does the Court consider legal arguments included in the parties' statements of fact.

DTNA manufactured the 2015 Freightliner Cascadia model semi-truck trailer at issue in this case (the "Freightliner").  The Freightliner is categorized as a "Class Eight" heavy truck due to its weight.

Donne Jefferson is a co-owner of Indian Creek Express, LLC ("Indian Creek"), a trucking company.  Jefferson has been in the trucking industry since 1992 and started Indian Creek in 1998.  Jefferson has had his commercial driver's license ("CDL") since 1992 or 1993 and has driven Freightliner brand trucks since approximately 1992.  He is not an engineer and has no education, training, or experience designing Class Eight heavy trucks.

Jefferson is responsible for and began purchasing trucks on behalf of Indian Creek in approximately 2002.  He considers himself a loyal Freightliner customer and has never purchased any other brand of trucks.  The type of equipment and options that can be specified on heavy trucks is extensive.  As co-owner of a trucking company, Jefferson believes it is important to stay educated and informed regarding the features and latest technology available on trucks; one reason is "to know the latest technology and how it's helping the industry for you to be more safe."[18]  Jefferson testified that he stays informed by: visiting the Freightliner website; attending

---

[17] *Mattioda v. White*, 323 F.3d 1288, 1291 (10th Cir. 2003).

[18] Doc. 118-1, Ex. A at 37:16–38:1.

on-site training opportunities sponsored by Freightliner and interacting with employees of

Daimler Trucks and Freightliner; interacting with the dealership, Floyd's Truck Center;

interacting with Freightliner's regional personnel; obtaining educational information from

trucking organizations and magazines; utilizing his own experience driving trucks; and

evaluating comments from his drivers.

Indian Creek has owned as many as 43 trucks.  Jefferson, on behalf of Indian Creek,

purchased the Freightliner in 2014, as part of a ten-truck order.  A WABCO OnGuard Collision

Warning System ("the OnGuard System") was an available option for the Freightliner.  The

OnGuard System included forward collision warning ("FCW") and automatic emergency

braking ("AEB") technology.  If a vehicle is equipped with an FCW system and a rear-end crash

is imminent, the FCW system warns the driver of the threat.  If a vehicle is equipped with an

AEB system and a rear-end crash is imminent but the driver takes no action or insufficient

action, the AEB system may automatically apply or supplement the brakes to avoid or mitigate

the rear-end crash.

The Freightliner Cascadia Driver Manual warned in part that the OnGuard System

> [I]s intended solely as an aid for an alert and conscientious
> professional driver.  It is not intended to be relied upon to operate a
> vehicle.  Use the system in conjunction with rearview mirrors and
> other instruments to safely operate the vehicle.  Operate the vehicle
> equipped with the OnGuard in the same safe manner as if the
> [collision warning system] were not present.[19]

The Maintenance Manual for the OnGuard System also states that the system is a driver

aid only and warns in part that the system "is no substitute for the most important factor in

vehicle safety, which is a safe, conscientious driver."[20]  It lists the driver's responsibilities to use

---

[19] Doc. 118-4, Ex. C, at 87.

[20] Doc. 118-5, Ex. D, at 4.

safe driving techniques; exercise proper judgment for the traffic, road, and weather conditions; maintain a safe distance between vehicles; and apply the brakes when needed to maintain control of the vehicle.[21]

A Bendix VORAD VS-400 Collision Warning System ("the VORAD System") was also an available option for the Freightliner.  The VORAD System included FCW technology.  The Freightliner Cascadia Driver Manual also warns in part that the system "is intended solely as an aid for an alert and conscientious professional driver," and that the system "may provide little or no warning of hazards such as pedestrians, animals, oncoming vehicles, or cross traffic."[22]

The "Driver Instructions" for the VORAD System similarly states that the system "is intended solely as an aid for an alert and conscientious professional driver" and "not to be used or relied upon to operate a vehicle."[23]  It also warns that the VORAD System "should only be used as a driving aid and not as a substitute for safe driving practices."[24]

Before purchasing the Freightliner, Jefferson was aware of the OnGuard System and the VORAD System and that the Freightliner could be equipped with either system.  When deciding how to specify the equipment on the Freightliner, Jefferson "considered the various sources of information" available to him.[25]  Before purchasing the Freightliner, he read journal and magazine articles about the OnGuard System and the VORAD System.  Bendix representatives

---

[21] *Id.*

[22] Doc. 118-4, Ex. C, at 81.

[23] Doc. 118-6, Ex. E, at 4.

[24] *Id.* at 7.

[25] Doc. 118-1, Ex. A, at 61:22–62:7, 96:23–97:11, 102:25–103:6.

also "briefly hit on" information about the VORAD System.[26]  Prior to purchase, Jefferson also

attended "Detroit/Freightliner events" and tested "the new Freightliner Cascadia" products.[27]

Prior to purchase, Jefferson had personal experience driving a truck equipped with a

collision mitigation system.  In deciding whether to equip the Freightliner with the OnGuard

System or the VORAD System, Jefferson balanced his perceived risks or drawbacks with his

perceived benefits of the systems, including "driver overreliance" and his concern about "drivers

becoming less involved or less attentive to the driving task."[28]  He also understood the "concept

of false alerts [and] nuisance alerts" with the systems.[29]  Jefferson also had concerns about

system reliability because in 2014, the systems were manufactured by third-party suppliers and

not under the "Freightliner umbrella."[30] Jefferson ultimately decided not to equip the Freightliner

with either system.

When he purchased the Freightliner, Jefferson knew he had an option to purchase other

heavy truck brands.  Had the OnGuard System or VORAD System been standard equipment on

the Freightliner, Jefferson "would have looked at other avenues."[31]  Other manufacturers of

heavy trucks, including Peterbilt, Kenworth, and Volvo, did not make a collision mitigation

system standard equipment in 2014.[32]

When DTNA made a collision mitigation system standard equipment on the New

Freightliner Cascadia in 2018, the customer had the option to de-select the equipment.  When

---

[26] *Id.* at 185:7–18; 188:10–189:25.

[27] *Id.* at 181:17–182:14.  It is not clear from Jefferson's testimony whether he tested the optional FCW and AEB systems.

[28] *Id.* at 98:8–99:12.

[29] *Id.* at 91:9–92:9.

[30] *Id.* at 88:13–89:12.

[31] *Id.* at 184:12–19.

[32] Docs. 121-1, Ex. O; 121-2, Ex. P; 121-3, Ex. Q; 121-4, Ex. R (filed under seal).

DTNA's competitors made a collision mitigation system standard equipment, those manufacturers also provided the customer the option to de-select the equipment.

The Freightliner in this case was equipped with a maximum road speed of 65 miles per hour and was equipped with air brakes that could be engaged by a driver as governed by Federal Motor Vehicle Safety Standards ("FMVSS") No. 121.  The Indian Creek fleet still utilizes 2015 model Freightliners and other trucks without collision mitigation systems.  Jefferson testified those trucks are slowed or stopped by using safe practices, including using brakes, Jake brakes, and downshifting.  Although his view that the driver is solely responsible for controlling the vehicle has not changed, he now elects to equip the trucks in his fleet with collision mitigation system options.[33]

### *The Accident*

On July 11, 2017, around 2:23 p.m., Teresa Butler accompanied by Karen Kennedy, Sheldon Cohen accompanied by Virginia Cohen, and Ricardo Mireles were driving their respective vehicles westbound on I-70.  Behind these three cars, Indian Creek driver Kenny Ford was operating the Freightliner.  Westbound traffic slowed, and Ford failed to adequately adjust the speed of the Freightliner, causing it to collide with the three passenger vehicles and kill all five occupants (the "Accident").

Indian Creek trains its drivers to be alert while driving a truck and its drivers have a responsibility and obligation to be alert while driving a truck.  Ford had his CDL at the time of the Accident and understood that the driver of a truck is responsible for all movements of the truck, including braking.  Ford understood that a truck hauling a load "takes a long time to stop"

---

[33] Doc. 118-1, Ex. A, at 185:24–186:13.

and "does not just stop on a dime."[34]  At the time of the Accident, Ford was familiar with the following commercial motor vehicle driving practices or concepts: seeing and looking ahead; controlling speed; awareness of potential hazards; following distance; maintaining full and complete attention; managing space; and avoiding distractions.  Ford knew from prior trips that he was approaching a construction zone at the time of the Accident.  That day, he saw the signage alerting motorists to the construction zone ahead.

### *Investigation and Subsequent Convictions*

The Kansas Highway Patrol ("KHP") investigators concluded the brakes on the Freightliner were operable at the time of the collision.  The KHP Critical Highway Accident Response Team concluded,

> Based on all the data provided, witness statements, and evidence gathered, Kenny Ford failed to observe traffic ahead.  This failure lead to the inability to stop his commercial motor vehicle, striking the vehicles in front of him.  Mr. Ford is responsible for the collision, and the subsequent deaths of Teresa Butler, Karen Kennedy, Sheldon Cohen, Virginia Cohen and Ricardo Mireles.[35]

Ford admitted that he drove recklessly on the day of the Accident, "but [he] wasn't intending it that way."[36]  Ford pleaded *nolo contendere* to five counts of vehicular homicide, a

---

[34] Doc. 118-14, Ex. M, at 87:12–23.

[35] Doc. 118-12, Ex. K, at 22.  Plaintiffs object to the admissibility of the KHP opinion under Fed. R. Evid. 703, arguing that it is based on insufficient facts because the KHP purportedly ignored the potential effect FCW and AEB systems would have had.  The Court overrules this objection, as any alleged failure to take collision mitigations systems into account goes to the opinion's weight, not its admissibility, and there is no indication that the report was based on inadmissible facts or data

[36] Doc. 118-14, Ex. M, at 155:16–156:23, 157:12–25.

personal misdemeanor.[37]  On August 20, 2020, he was sentenced to five one-year terms, to be served consecutively, for a total of 60 months' imprisonment.[38]

### NHTSA

On February 19, 2015, several interest groups, including the Truck Safety Coalition, the Center for Auto Safety, Advocates for Highway and Auto Safety, and Road Safe America, filed a petition for rulemaking with the National Highway Traffic Safety Administration ("NHTSA"), requesting the establishment of a new FMVSS to require vehicle manufacturers to install forward collision avoidance and mitigation systems on all vehicles with a gross vehicle weight rating ("GVWR") of 10,000 pounds or more.  On October 16, 2015, NHTSA formally granted the rulemaking petition, announcing it would explore pursuing a safety standard to "require automatic forward collision avoidance and mitigation systems" on vehicles with a GVWR greater than 10,000 pounds, but stating

> The granting of the petition . . . does not mean that the agency will issue a final rule . . . . The determination of whether to issue a rule is made after study of the requested action and the various alternatives in the course of the rulemaking proceeding, in accordance with statutory criteria.[39]

---

[37] Doc. 118-16, Ex. V.  Plaintiffs argue that Ford's criminal convictions for vehicular homicide are inadmissible hearsay under Fed. R. Evid. 803(22) because they followed a "no contest" plea. Plaintiffs' objection is overruled.  A certified copy of the Judgment of conviction is admissible under Rule 803(8) as a public record.  Moreover, Ford's convictions are not needed for DTNA to prove the facts underlying his conviction, *i.e.*, that he "failed to observe the slower moving traffic up ahead on I-70 and crashed the Subject Freightliner into the Butler, Cohen, and Mireles vehicles," as Plaintiffs allege in their Complaint.  Doc. 36 ¶ 41.  Instead, Ford's convictions show "the fact of the conviction[s] [themselves]," *i.e.*, that his conduct resulted in criminal convictions.  *See United States v. Adedoyin*, 369 F.3d 337, 345 (3d Cir. 2004) (explaining a conviction following a no-contest plea is admissible "to prove the fact of the conviction itself," as opposed to "the facts related to the underlying conviction.").  Further, the no contest plea is not being admitted as proof of guilt against non-party Ford as a defendant in a civil case, and no purpose contemplated by the Rules is furthered by excluding his convictions.  *See Rose v. Uniroyal Goodrich Tire Co.*, 219 F.3d 1216. 1220 (10th Cir. 2000) (discussing reasons behind holding no contest pleas inadmissible).

[38] Doc. 118-16, Ex. V.

[39] Doc. 118-15, Ex. N, at 62488.

In 2018, NHTSA issued a notice regarding its *Field Study of Newer Generation Heavy Vehicle Automatic Emergency Braking (AEB) Systems*, stating in part:

> As both of the major AEB system suppliers have released new products in the second half of 2017, NHTSA is interested in the real world performance of these new systems, which are designed to address the shortcomings of the previous generation of AEB systems.  These systems have been designed to offer improved threat detection and new features such as stationary object braking. Additionally, a new product called Detroit Assurance™ was released in 2016 for Freightliner trucks by Detroit Diesel Corporation.  This system shares many features with the OnGuard and Wingman® products including advanced emergency braking (AEB), forward collision warnings (FCW), and adaptive cruise control (ACC).[40]

On August 5, 2021, NHTSA issued a "First Amended Standing General Order 2021-01," pertaining to incident reporting for Automated Driving Systems (ADS) and Level 2 Advanced Driver Assistance Systems (ADAS), which includes AEB technology.  NHTSA's Order states in part:

> Given the rapid evolution of these technologies and testing of new technologies and features on publicly accessible roads, it is critical for NHTSA to exercise its robust oversight over potential safety defects in vehicles operating with ADS and Level 2 ADAS.
>
> The Safety Act is preventive, and the identification of safety defects does not and should not wait for injuries or deaths to occur. *See, e.g., United States v. Gen. Motors Corp.*, 565 F.2d 754, 759 (D.C. Cir. 1977) ("The purpose of the Safety Act . . . is not to protect individuals from the risks associated with defective vehicles only after serious injuries have already occurred; it is to prevent serious injuries stemming from established defects before they occur.")[.]
>
> * * * *
>
> Vehicles operated using Level 2 ADAS present safety risks to occupants of those vehicles and other roadway users, in part due to the unconventional division of responsibility between the vehicle

---

[40] Doc. 118-8, Ex. G, at 48509.

and its human driver.  Misuse of an ADAS (including overreliance by a driver) may create a foreseeable risk and potential safety defect.  *See, e.g., United States v. Gen. Motors Corp.*, 518 F.2d 420, 427 (D.C. Cir. 1975) (explaining that failures caused by foreseeable misuse of pickup trucks could support finding of a safety defect under the Safety Act).  Other potential safety issues with vehicles operating using Level 2 ADAS include the design and performance of sensors, software algorithms, and other technology used to analyze and respond to the vehicle's environment; technology and strategies to ensure appropriate driver engagement; and the evolution of the system over time through software updates.[41]

### Infrastructure Act

On November 15, 2021, H.R. 3684, the Infrastructure Investment and Jobs Act ("Infrastructure Act"), was signed into law.[42]  The Infrastructure Act directs the NHTSA, within two years of enactment, to prescribe a standard requiring certain commercial motor vehicles to be equipped with an "automatic emergency braking system," defined to include both FCW and AEB technology,[43] as well as performance requirements for such systems.[44]  NHTSA is to "conduct a review of automatic emergency braking systems in use in applicable commercial motor vehicles and address any identified deficiencies with respect to those automatic emergency braking systems in the rulemaking proceeding to prescribe the standard, if practicable;"[45] and "consult with representatives of commercial motor vehicle drivers regarding the experiences of drivers with automatic emergency braking systems in use in applicable commercial motor

---

[41] Doc. 118-9, Ex. H, at 3, 5 (footnote omitted).

[42] Doc. 118-17, Ex. W.

[43] Pub. L. No. 117-58 § 23010(a).

[44] *Id.* § 23010(b)(1).

[45] *Id.* § 23010(b)(2)(A).

vehicles, including any malfunctions or unwarranted activations of those automatic emergency braking systems."[46]

## III.    Discussion

DTNA moves for summary judgment on Plaintiffs' product liability claims on the grounds that they cannot prove the defect or causation elements of their claims.  DTNA also argues that Plaintiffs' claims are impliedly preempted, revisiting the Court's rejection of this argument in its order denying DTNA's motion to dismiss.  As DTNA notes, any one of these grounds entitles it to summary judgment.  The Court first addresses DNTA's preemption defense, then turns to the merits of Plaintiffs' product liability claims.

### A.    Preemption

The Supremacy Clause of the United States Constitution renders state law "without effect" if it conflicts with federal law.[47]  Preemption may either be express or implied.[48] Whether express or implied, a preemption inquiry typically "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."[49]  Express preemption occurs where a federal law or regulation "define[s] explicitly the extent to which its enactments pre-empt state law."[50] Implied preemption includes both field preemption and conflict preemption.  Implied field preemption occurs where "the scope of a statute indicates that Congress intended federal law to

---

[46] *Id.* § 23010(b)(2)(B).

[47] *Cipollone v. Liggett Grp.*, 505 U.S. 504, 516 (1992).

[48] *Boyz Sanitation Serv., Inc. v. City of Rawlins*, 889 F.3d 1189, 1198 (10th Cir. 2018).

[49] *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[50] *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (alteration in original) (quoting *Choate v. Champion Home Bld'rs Co.*, 222 F.3d 788, 792 (10th Cir. 2000)).

occupy a field exclusively."[51]  Conflict preemption is further categorized as either impossibility preemption, where it is "impossible for a private party to comply with both state and federal requirements," or obstacle preemption, "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[52]

DTNA first raised this defense in a Rule 12(b)(6) motion to dismiss, where it argued that implied obstacle preemption applied to bar Plaintiffs' products liability claims against DTNA because NHTSA was in the process of deciding whether it should establish a safety standard to require FCW or AEB technology for commercial motor vehicles such as the Freightliner.  The Court rejected DTNA's argument at the dismissal stage of the proceedings.[53]  The Court noted that "NHTSA has explicitly stated that its current, pending rulemaking regarding AEB/FCW may result in no regulatory action whatsoever[,]"[54] and reasoned "NHTSA's inaction does not convey any authoritative message of a federal policy against FCW or AEB systems," citing the lack of any such message in NHTSA's 2015 Notice of Proposed Rulemaking or NHTSA's 2012 Request for Comment.[55]  The Court concluded, "[o]n this record, the Court [was] not convinced that NHTSA's actions reflect a federal regulatory objective sufficient to trigger implied obstacle preemption."[56]

---

[51] *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002) (citation omitted).

[52] *Emerson*, 503 F.3d at 1129 (quoting *Sprietsma*, 537 U.S. at 64).

[53] Doc. 45.

[54] *Id.* at 28–29.

[55] *See id.* at 33.

[56] *Id.* (emphasis added).

In so ruling, the Court found the Supreme Court's opinion in *Sprietsma v. Mercury Marine*[57] to be "particularly instructive."[58]  In that case, the plaintiff sued a boat's engine designer following a boating accident in which the decedent was struck by the boat's propeller.[59]  The plaintiff alleged, among other things, that the boat was unreasonably dangerous because it did not have a propeller guard.[60]  The lower courts all found the plaintiff's claims were preempted by the Federal Boat Safety Act ("FBSA") and the Coast Guard's regulatory authority promulgated thereunder.[61]  The Supreme Court reversed, holding that the plaintiff's common law state tort claims—including the design defect claims—were not preempted by the FBSA or any other federal law or regulation.[62]  The defendant relied on the Coast Guard's decision not to adopt a regulation requiring propeller guards on motorboats.[63]  The Supreme Court made clear that "[i]t is quite wrong to view th[e] decision" not to adopt a regulation requiring propeller guards "as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation."[64]  The Court reached this conclusion even though the Coast Guard had conducted significant research into propeller guards and made an "undoubtedly intentional and carefully considered" decision not to implement a regulation.[65]  Because the Coast Guard's explanation for its decision not to promulgate a rule "d[id] not

---

[57] 537 U.S. 51, 64 (2002).

[58] Doc. 45 at 29.

[59] 537 U.S. at 54–55.

[60] *Id.* at 55.

[61] *Id.*

[62] *Id.* at 64–68.

[63] *Id.* at 65.

[64] *Id.*

[65] *Id.* at 67.

convey an 'authoritative' message of a federal policy against propeller guards," that decision was not given preemptive effect.[66]

This Court also distinguished two other Supreme Court opinions cited by DTNA in support of its preemption claim—*Geier v. American Honda Motor Co.*[67] and *Williamson v. Mazda Motor of America*.[68]  The Court noted that these cases instruct courts to consider an agency's reasoning for implementing a regulation; if the reason is not tied to a significant regulatory objective, even compliance with a federal regulation is not sufficient to insulate a manufacturer from state law tort claims based on a vehicle's design.[69]  In the instant case, NHTSA did not provide Class Eight truck manufacturers with a choice between different crash-mitigation technologies, instead opting not to issue any final rule requiring or prohibiting such systems.[70]

DTNA reframes the preemption issue on summary judgment.  DTNA stresses that since the Court's January 2020 decision, the Infrastructure Act was passed and signed into law on November 15, 2021, directing the NHTSA to prescribe a standard requiring certain commercial motor vehicles to be equipped with an automatic emergency braking system, defined to include both FCW and AEB technology, as well as performance requirements for such systems.  Prior to the effective date of the Infrastructure Act, NHTSA made public statements about performance requirements for commercial motor vehicles, including deficiencies such as malfunctions or unwarranted activations.  In 2018, NHTSA published a notice regarding its *Field Study of Newer*

---

[66] *Id.*

[67] 529 U.S. 861 (2000).

[68] 562 U.S. 323 (2011).

[69] Doc. 45 at 31–33.

[70] *Id.*

*Generation Heavy Vehicle Automatic Emergency Braking (AEB) Systems*, where it stated the previous generation of AEB systems had "shortcomings."[71]  More recently, on August 5, 2021, NHTSA issued a "First Amended Standing General Order 2021-01," pertaining to incident reporting for Automated Driving Systems ("ADS") and Level 2 Advanced Driver Assistance Systems ("ADAS"), which includes AEB technology.  DTNA now argues that Plaintiffs' product liability claims are impliedly preempted because these recent statements by NHTSA conveyed an authoritative message against requiring FCW or AEB technology *as it existed in 2014*, rather than *generally* as the Court previously addressed.

After this matter was briefed, the Arizona Supreme Court issued its decision in *Varela v. FCA US LLC*,[72] which Plaintiffs cite as supplemental authority in opposition to DTNA's preemption argument.[73]  At issue in that case was "whether, in the absence of a promulgated safety regulation, the [NHTSA] has established a clear policy objective concerning [AEB] technology that preempts state tort law claims based on an auto manufacturer's alleged failure to install AEB."[74]  In 2017, the NHTSA denied a petition to initiate rulemaking that would have mandated the installation of AEB in all lightweight vehicles like the Jeep Grand Cherokee involved in that case because nonregulatory efforts have been or were proving successful.[75]  The *Varela* court concluded that *Sprietsma* and *Williams* controlled the implied preemption analysis, not *Geier*.[76]

---

[71] Doc. 118-8, Ex. G.

[72] 505 P.3d 244 (Ariz. 2022).

[73] Doc. 128.

[74] 505 P.3d at 250.

[75] *Id.* at 252.

[76] *Id.* at 263.

The *Varela* court concluded that, like *Sprietsma*, the matter before it "lack[ed] a promulgated safety standard addressing the equipment in question" and found *Sprietsma* "instructive with respect to weighing an agency's judgment in our determination of whether [NHTSA] has conveyed an authoritative message concerning the regulation of AEB for our preemption analysis."[77]  The court concluded that NHTSA "has neither conveyed an authoritative statement establishing manufacturer choice as a significant policy objective nor made explicit a view that AEB should not be regulated."[78]  The *Valera* court also overruled *Dashi v. Nissan North America, Inc.*,[79] which DTNA relied upon in support of its motion to dismiss.[80]  In that case, the Arizona Court of Appeals relied on *Geier* in granting summary judgment on implied obstacle preemption grounds similar to those raised here.[81]

DTNA argues that *Valera* is inapposite, as it involved light vehicles and did not address NHTSA's pending rulemaking regarding FCW and AEB technology for commercial motor vehicles, or the Infrastructure Act, which directs NHTSA to prescribe performance standards for FCW and AEB technology on commercial motor vehicles.[82]  DTNA argues that the 2018 and 2021 statements from NHTSA, which were neither considered by *Varela* nor previously before this Court, show that NHTSA has decided to forego rules or regulations requiring FCW or AEB technology as it existed in 2014—the only form of technology at issue in this case—and that the NHTSA has stated the 2014 technology has "shortcomings," and presents "safety risks to occupants of those vehicles and other roadway users," "'potential safety defect[s]' due to driver

---

[77] *Id.* at 261.

[78] *Id.* at 262.

[79] 445 P.3d 13 (Ariz. Ct. App. 2019).

[80] 505 P.3d at 260–61.

[81] *Dashi*, 445 P.3d at 21.

[82] Doc. 130.

'overreliance,' and 'potential safety issues.'"[83]   DTNA urges that it no longer relies on *Dashi* for

its new, narrower presumption argument, and even if *Varela* is correct that NHTSA has not

conveyed an authoritative message against collision mitigation technology generally, NHTSA

has done so with respect to the technology existing in 2014.

While not controlling, the Court finds the analysis in *Varela* persuasive authority relevant

to the implied obstacle preemption defense at issue here.  As noted, this Court previously found

that *Sprietsma* provides the appropriate guidance for the Court's preemption determination.

Thus, the issue before the Court is whether the 2018 and 2020 publications express an

authoritative decision by the NHTSA from which this Court should infer obstacle preemption of

claims based on FCW or AEB technology as it existed in 2014.

In *Sprietsma*, the Supreme Court noted that the Coast Guard "most definitely did not

reject propeller guards as unsafe."[84]  Instead, because the apparent focus was on the lack of any

"universally acceptable" propeller guard for "all modes of boat operation," "nothing in its

official explanation would be inconsistent with a tort verdict premised on a jury's finding that

some type of propeller guard should have been installed on this particular boat equipped with

respondent's particular type of motor."[85]  The Supreme Court held that, in order to preempt state

law by a determination to forego regulation, there must be an indication that this determination

"would be inconsistent with a tort verdict premised on" the finding that the unregulated product

caused the plaintiff's injury.[86]  DTNA attempts to distinguish *Sprietsma*, arguing that a jury

finding in this case that the absence of 2014 technology rendered the Freightliner unsafe would

---

[83] Doc. 118 at 40 (quoting Doc. 118-9, Ex. H ¶ 72).

[84] 537 U.S. 51, 67 (2002).

[85] *Id.*

[86] *Id.*

be inconsistent with NHTSA's statements—effectively faulting DTNA for failing to include the very same technology that NHTSA has stated might be defective itself.  DTNA argues that, unlike *Sprietsma*, NHTSA has conveyed an authoritative message against requiring FCW or AEB technology as it existed in 2014.

The Court concludes that the NHTSA did not convey such an authoritative statement or message.  While the 2018 and 2021 NHTSA statements acknowledge that the FCW and AEB technology available in 2014 when the Freightliner was manufactured may not be as reliable as similar technologies available in equipping future heavy trucks, nothing in these statements changes the Court's previous finding that neither the 2012 nor the 2015 NOPR makes any authoritative statement of a federal policy against FCW or AEB systems from which the Court should infer obstacle preemption.[87]  The same is true for the more recent publications from NHTSA, which illustrate why the NHTSA has not promulgated rules or regulations requiring FCW or AEB technology as it existed in 2014 "or even as it exists today."[88]  This decision not to regulate FCW or AEB technology generally, which appears to continue to be grounded in the need for continued research and improvement of the system technology, does not convey the narrow authoritative message that FCW and AEB that existed in 2014 should not be regulated. Other than the now-overruled *Dashi* opinion, the Court is unable to locate authority supporting  a

---

[87] Doc. 45 at 30–31.

[88] Doc. 118 at 41.

finding of preemption under these circumstances.[89]  Accordingly, Plaintiffs' claims are not

preempted by federal law.[90]

### B.    Defective Condition

Plaintiffs assert claims against DTNA, as manufacturer of the Freightliner, for strict

product liability and negligence based on DTNA's failure to equip the Freightliner with FCW

and AEB technology as standard equipment.  Kansas substantive law applies to Plaintiffs'

claims.[91]   Under the Kansas Products Liability Act ("KPLA"),[92] "all legal theories of recovery,

e.g., negligence, strict liability, and failure to warn, are to be merged into one legal theory called

a 'product liability claim.'"[93]   To succeed on their defective product claims, Plaintiffs "must

produce proof of three elements: (1) the injury resulting from a condition of the product; (2) the

condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the

defendant's control."[94]

"With respect to the second element of proof, Kansas courts require 'that a product be

*both* defective and unreasonably dangerous.'"[95]   "Kansas substantive law provides that every

---

[89] *See Ali v. TransLines, Inc.*, No. 4:21CV214 HEA, 2022 WL 1316357, at *4 (E.D. Mo. May 3, 2022) (citing *Varela v. FCA US LLC*, 505 P.3d 244 (Ariz. 2022)) (rejecting preemption defense in product liability claim against manufacturer of a Volvo semi-truck trailer without crash avoidance technology because the plaintiffs failed to identify a particular regulation governing such systems).

[90] Nor does the directive in the Infrastructure Act change this outcome.  DTNA argues that given NHTSA's statements about shortcomings and perceived safety risks of earlier systems, there is "no doubt" that NHTSA will promulgate performance standards exceeding the technology that existed in 2014.  But this argument overlooks K.S.A. § 60-3307, which provides that the "operative event is the date when the product was first designed or sold; consequently, what might occur thereafter can have no bearing on the issue of an alleged defect in the product." *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 861 P.2d 1299, 1308 (Kan. 1993).

[91] *Hiner v. Deere & Co.*, 340 F.3d 1190, 1192 (10th Cir. 2003).

[92] K.S.A. § 60-3301, *et seq.*

[93] *Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1202 (D. Kan. 1999) (quoting *Patton*, 861 P.2d at 1311).

[94] *Id.* (quoting *Jenkins v. Amchem Prods., Inc.*, 886 P.2d 869, 886 (1994)).

[95] *Id.* (quoting *Jenkins*, 886 P.2d at 886).

products liability action must be based on a defective condition in the product, regardless of the theory of recovery."[96]   "Kansas law recognizes only three ways in which a product may be defective: (1) a manufacturing defect; (2) a warning defect; and (3) a design defect."[97]

A "manufacturing defect" is "a flaw in the manufacturing of the product."[98]   A "design defect" exists when "a product which although perfectly manufactured contains a defect that makes it unsafe."[99]   A "warning defect" exists when there is "a failure to adequately warn of a risk or hazard related to the product design."[100]   DTNA argues that Plaintiffs cannot prove the existence of a defect because (1) the Freightliner did not have a cognizable manufacturing, warning, or design defect; and, alternatively, (2) Plaintiffs' defect theory is barred by the optional equipment doctrine.

Plaintiffs withdraw their manufacturing defect theory and assert that they have a submissible case based on warning and design defects.  Relying on *Delaney v. Deere & Co.*, Plaintiffs argue that both the Kansas Supreme Court and the Tenth Circuit have recognized the viability of their warning and design defect claims.[101]   In that case, the Kansas Supreme Court answered two questions certified by the Tenth Circuit, holding: (1) under K.S.A. § 60-3305(c), the KPLA applies only to claims of warning defects, not manufacturing or design defects;[102] and

---

[96] *Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1181 (10th Cir. 1995).

[97] *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 920 (10th Cir. 2005) (citing *Delaney v. Deere & Co.*, 999 P.2d 930, 936 (2000)).

[98] *Baughn v. Eli Lilly & Co.*, 356 F. Supp. 2d 1177, 1183 (D. Kan. 2005) (citing *Savina v. Sterling Drug Inc.*, 795 P.2d 915, 923 (Kan. 1990)).

[99] *Id.*

[100] *Id.*

[101] 999 P.2d 930 (Kan. 2000).

[102] K.S.A. § 60-3305(c) provides: "In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend . . . to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product."

(2) "an adequate warning does not foreclose a finding that a product is defectively designed."[103] As discussed below, however, DTNA does not argue that § 60-3305(c) applies to Plaintiffs' design-defect claims, nor does it argue the Freightliner had a warning that forecloses a design defect and *Delaney* does not validate their warning- or design-defect claims.

### 1.       Warning Defect

Plaintiffs' warning-defect theory is based on DTNA's failure to "adequately warn of the risks associated with failing to equip the Freightliner with FCW and AEB systems."[104]  The starting point for the Court's analysis is to recognize that "[a] product, though perfectly designed and manufactured, may be defective if not accompanied by adequate warnings of its dangerous characteristics."[105]  "Kansas courts have stressed that manufacturers should not be held liable for failing to warn about risks that would be apparent to ordinary users.  Moreover, regardless of the ordinary user's knowledge of the danger, '[t]here is no duty to warn of dangers *actually known* to the user of the product.'" [106]

In *Hiner v. Deere & Co.*, decided after *Delaney*, the Tenth Circuit squarely addressed Plaintiffs' warning-defect theory under Kansas law—that DTNA failed to adequately warn of the risks associated with failing to equip the Freightliner with FCW and AEB systems.[107]  In that case, the plaintiff was severely injured when a round hay bale rolled off a front-end loader on a tractor that was not equipped with either a roll-over protection system to which a canopy can be

---

[103] *Delaney*, 999 P.2d at 940, 946.

[104] Doc. 123 at 36.

[105] *Hiner v. Deere & Co.*, 340 F.3d 1190, 1193 (10th Cir. 2003) (alteration in original) (quoting *Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1181 (10th Cir. 1995)).

[106] *Id.* at 1194 (alteration in original) (first quoting *Miller v. Lee Apparel Co.*, 881 P.2d 576, 588 (Kan. Ct. App. 1994); and then quoting *Long v. Deere & Co.*, 715 P.2d 1023, 1029 (Kan. 1986)).

[107] *Id.* at 1197.

attached, which prevents objects from falling onto the operator, or bale grapples and spears that are used to secure large round bales on front-end loaders.[108]  The plaintiff in *Hiner* asserted a warning-defect claim based on the manufacturer's failure to warn of the risks associated with failing to equip a front-end loader on a tractor with a self-leveling safety device.[109]  The Tenth Circuit held that the manufacturer of the tractor was entitled to summary judgment because the purchaser "was familiar with available safety features," but did not purchase them.[110]  The purchaser also knew of the risk at issue, specifically, "objects . . . falling off loaders onto tractor operators."[111]  The Tenth Circuit observed that the plaintiff "understood that the loader bucket should be kept level as the loader is raised, in order to prevent the load from becoming unstable and falling," and thus Deere & Co. had no duty to warn the plaintiff of the need for protection against falling objects.[112]

Citing *Hiner*, DTNA argues that both Jefferson and Ford were well aware of the danger addressed by FCW and AEB technology—inattentive driving and/or failure to brake or stop—so DTNA did not have to warn about the risks associated with not including such technology.  The Court agrees.  Here, the OnGuard System included FCW and AEB technology and the VORAD system included FCW technology.  Like the plaintiff in *Hiner*, it is uncontroverted that Jefferson (the purchaser of the Freightliner) was familiar with the both collision mitigation systems and their purpose, but decided not to purchase those systems, despite knowing they both were available options for the Freightliner.

---

[108] *Id.* at 1192.

[109] *Id.*

[110] *Id.* at 1197.

[111] *Id.*

[112] *Id.*

Further, it is uncontroverted that both Jefferson and Ford (the operator of the Freightliner) knew the risks associated with inattentive driving and/or failing to brake or stop a heavy commercial truck for slowed or stopped traffic in a construction zone. Neither Jefferson nor Ford needed DTNA to warn them of the dangers of failing to do so because both men would have readily known such dangers to exist without any warning based on their experience and training as CDL drivers. Indeed, driving heavy commercial trucks without a collision mitigation system had been the norm throughout both men's many years of commercial driving experience up to 2014, when the technology became available. Given that "[t]here is no duty to warn of dangers *actually known* to the user of a product,"[113] the Court concludes that DTNA had no duty to warn Jefferson of the risks associated with failing to equip the Freightliner with FCW or AEB technology. DTNA is entitled to summary judgment with respect to its warning-defect claim.

### 2.    Design Defect

Plaintiffs further allege the 2014 Freightliner was defective because its design did not include FCW and AEB technology as standard equipment. The Kansas Supreme Court has ruled that design-defect claims should be assessed using the so-called "consumer expectations" test described in Comment i to the Restatement (Second) of Torts § 402A.[114] Comment i "defines an unreasonably dangerous product as one which is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'"[115] "The Kansas courts have 'continually reaffirmed that the consumer expectations test is the test in Kansas with regard to design

---

[113] *Id.* at 1194 (alteration in original) (quoting *Long v. Deere & Co.*, 715 P.2d 1023, 1029 (Kan. 1986)); *accord Miller v. Lee Apparel Co.*, 881 P.2d 576, 588 (Kan. Ct. App. 1994).

[114] *Lester v. Magic Chef*, 641 P.2d 353, 361 (Kan. 1982) (Prager, J., dissenting).

[115] *Delaney v. Deere & Co.*, 999 P.2d 930, 944 (Kan. 2000) (quoting the comment).

defects.'"[116]  The relevant time for assessing a product's alleged dangerousness is "when it leaves the seller's hands"—here, 2014.[117]

As required by FMVSS 121, heavy trucks like the Freightliner utilize air brake systems to slow and stop the truck.  Plaintiffs have not shown that the ordinary consumer of a heavy truck— a CDL-licensed driver—would have contemplated that a vehicle that was not equipped with nascent FCW or AED systems was unreasonably dangerous.  On the contrary, as acknowledged by Jefferson and Ford—both CDL-licensed drivers—to avoid hitting forward traffic, the driver must remain attentive, maintain a proper speed and following distance, and depress the brake pedal sufficiently in advance of forward traffic.  Both the OnGuard System and VORAD System available in 2014 were merely aids to a driver accomplishing a timely stop, not the means upon which a driver could rely to do so.  It is undisputed that the Freightliner's air brakes were fully operational at the time of the accident.  Thus, under the consumer expectation test, a heavy truck with an air brake system is no more dangerous than an ordinary consumer in 2014 would consider it to be and the absence of a collision mitigation system did not render the Freightliner unreasonably dangerous or defective.[118]

---

[116] *Hiner*, 340 F.3d at 1197 (quoting *Delaney v. Deere & Co.*, 999 P.2d 930, 944 (Kan. 2000)).

[117] *Lenherr v. NRM Corp.*, 504 F. Supp. 165, 172 (D. Kan. 1980) (citing Restatement (Second) of Torts § 402A, cmt. g); *see also Kinser v. Gehl Co.*, 184 F.3d 1259, 1270 (10th Cir. 1999) (quoting *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 861 P.2d 1299, 1307 (Kan. 1993) ("If a product is not defective when it is first sold, it does not thereafter become defective by reason of technological improvements or other knowledge gained by the manufacturer."))).

[118] *See Hiner*, 340 F.3d at 1197 (citing Restatement (Second) of Torts § 402A, cmt. i) (suggesting that the manufacturer "might have sought to affirm summary judgment on the design-defect claims on a ground quite similar to the ground that largely prevailed with respect to the warning-defect claims—that is, that the equipment was no more dangerous than an ordinary consumer would consider it to be.").  Although dicta, the Court is persuaded by the Tenth Circuit's opinion on this issue.  *See Kan. Nat. Res. Coalition v. U.S. Dep't of the Interior*, 382 F. Supp. 3d 1179, 1185 (D. Kan. 2019) (explaining dicta is "indicative of the stance that the Tenth Circuit would take if the issue was squarely before it.").

As Plaintiffs make clear, their design-defect theory effectively asserts that the Freightliner could have been made *safer* with the inclusion of the FCW or AEB technology, going so far as to suggest that had the Freightliner been so equipped, the Accident could have been prevented or mitigated.  But "[i]n a defective design case, it is not enough for the plaintiff simply to prove that a different design would have mitigated or avoided the plaintiff's injuries."[119]  Even assuming the collision mitigation systems would have added to the safety of the Freightliner, the various manuals make clear that these systems are merely aids, not substitutes for safe driving.  Plaintiffs do not allege the absence of FCW or AEB technology rendered the Freightliner incapable of being operated by an attentive driver, of being operated at a proper speed and at a safe distance from other vehicles, or of being slowed or stopped with air brakes engaged by the driver.  Accordingly, DTNA is also entitled to summary judgment on Plaintiffs' design-defect claim.

Because summary judgment is appropriate on Plaintiffs' design- and warning-defect claims, the Court need not consider DTNA's alternative basis for summary judgment under the so-called "optional equipment doctrine,"[120] or on the additional ground that Plaintiffs' product liability claims would fail for lack of causation.[121]

---

[119] *Duffee ex rel. Thornton v. Murray Ohio Mfg. Co.*, 879 F. Supp. 1078, 1085 (D. Kan. 1995) (citing *Garst v. Gen. Motors Corp.*, 484 P.2d 47, 60 (Kan. 1971)).

[120] The Kansas Supreme Court has not addressed the optional equipment doctrine, under which a manufacturer of a multi-use product is not negligent if a purchaser failed to purchase optional safety equipment that would have prevented the accident.  *Compare Parks v. Ariens Co.*, 829 F.3d 655, 658 (8th Cir. 2016) (predicting that the Iowa Supreme Court would apply the doctrine) *with Wilda v. JLG Indus., Inc.*, No. 16-cv-1008, 2021 WL 392705, at *(N.D. Ill. Feb. 3, 2021) (rejecting doctrine under Illinois law as impermissibly delegating safety decisions to consumers).  Given the disposition of Plaintiffs' design- and warning-defect claims, the Court declines to predict how the Kansas Supreme Court would rule or, as Plaintiffs suggest, certify the question to the Kansas Supreme Court.  *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 930–31 (10th Cir. 2018).

[121] DTNA contends that Ford's inattentiveness, recklessness, and adjudicated criminal conduct is an independent intervening cause that breaks any causal connection between a defendant's earlier act and the plaintiff's injury.  DTNA further contends that Plaintiffs' theory of causation rests on unfounded and refuted speculation that the Freightliner would have been equipped with FCW or AEB technology had DTNA made such technology standard, despite Jefferson's assertion that he did not want the offered collision mitigation systems.  The Court notes

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant DTNA's Motion for Summary Judgment (Doc. 117) is **granted**.

**IT IS SO ORDERED.**

Dated: June 16, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

that "[c]ausation is normally a question of fact for a jury." *Kincaid v. Kubota Tractor Corp.*, 464 P.3d 43 (Table), 2020 WL 3022977, at *7 (Kan. Ct. App. June 5, 2020) (first citing *Est. of Belden v. Brown Cnty.*, 261 P.3d 943, 949 (Kan. Ct. App. 2011); and then citing *Garay v. Mo. Pac. R.R.,* 38 F. Supp. 2d 892, 899 (D. Kan. 1999)).  As Plaintiffs point out, Kansas is a comparative fault state; under K.S.A. 60-258a, "a jury may compare the fault of any party whose negligence caused or contributed to an accident." *Id.* at *7; *see* Doc. 88 (DTNA's Comparative Fault Designation against Ford and Indian Creek).